FILED
2013 May-20  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **ROSS WILLIAMS,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **2:11-CV-3629-KOB** |
| ] | |
| **DAIICHI SANKYO, INC.,** ] | |
| ] | |
| **Defendant.** ] | |
| ] | |

**MEMORANDUM OPINION**

This matter comes before the court on Defendant Daiichi Sankyo, Inc.'s "Motion for Summary Judgment." (Doc. 45).  Plaintiff Ross Williams claims that DSI  discriminated against him on the basis of his gender and retaliated against him because another DSI employee, District Manager Philip Lamb, filed an EEOC Charge against DSI. DSI argues that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law on Mr. Williams' discrimination and retaliation claims. DSI argues that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law on Plaintiff Ross Williams' two remaining claims before the court. For the following reasons, the court agrees with the Defendant and will GRANT its motion for summary judgment in its entirety and DISMISS WITH PREJUDICE Mr. Williams' claims against DSI.

I.      STATEMENT OF FACTS

     A.      Factual Background

          1.      Mr. Williams' Employment at DSI

On January 7, 2008, Mr. Williams began working as a pharmaceutical sales representative for DSI in the Birmingham District, and DSI terminated Mr. Williams on November 4, 2008. DSI trained Mr. Williams for this position at the outset of his employment. Pharmaceutical sales representatives, like Mr. Williams, promote DSI's drugs primarily by visiting the offices of doctors who may prescribe DSI's drugs, explaining the advantages of particular drugs, and providing samples of DSI drugs for doctors to give to their patients. Sales representatives' salaries are based in part on incentive compensation earned from sales and sales ranking. DSI alleges that the distribution of samples is a "critical responsibility" of its sales representatives and that DSI sales representatives in Birmingham are expected to make eight to ten calls to doctors' offices a day and deliver samples of DSI drugs on 60-80% of their calls. (Doc. 46, at ¶ 8; Doc. 47-6, at ¶ 12).

Mr. Williams, however, stated in his affidavit that during his training at DSI he was "instructed not to distribute samples of DSI drugs to doctors unless they requested them." (Doc. 60-2, at ¶ 6). Mr. Williams also asserted that he was "never told to sample 60-80 percent" of his office calls until October 1, 2008 and that he was "never told by DSI management or employees that making 8 to 10 calls and distributing samples was a critical job performance criteria that could lead to [his] termination." (Doc. 60-2, at ¶ 12-15). However, Mr. Williams does not dispute that he sent an e-mail on July 10, 2008 to Kerri Colvin, his Regional Director, acknowledging that he knew the 60-80% sampling guideline. (Doc. 47-4, at 32). Mr. Williams

does not dispute that from the time he was hired in January 2008 until June 30, 2008 he only

distributed samples to doctors during two weeks.

DSI alleges that it gave Mr. Williams a document entitled "[Southeast] Area

Representative Expectations," and that Mr. Williams was expected to meet those expectations.

Those expectations included:

- utilize the computer in the field daily for reviewing pre-call planning and enter post-call notes
- enter and synchronize calls daily
- sample in accordance with Management's description
- consistently adhere to all district, regional, and corporate deadlines
- electronically submit expense reports by the 4th of each month
- submit budget trackers monthly
- mail sample distribution forms weekly
- adhere to DSI's [standards of procedure] and Compliance Guidelines

(Doc. 47-4, at 26-27). Mr. Williams alleges that he did not receive this document until October

2008, shortly before he was terminated. (Doc. 60-2, at ¶ 12).  However, in his deposition and e-

mails sent to various DSI supervisors, Mr. Williams demonstrated an understanding of most, if

not all, of these documenting and compliance expectations during his employment at DSI.

The parties do not dispute that it is "crucial" that sales representatives document and

inventory the distribution and transfer of their samples to comply with FDA regulations. When

sales representatives distribute samples to doctors, they must complete a sample distribution

form ("SDF"), and sales representatives must submit all SDFs to DSI weekly. Mr. Williams did

not submit a single SDF from July 25, 2008 to September 26, 2008.

From January 2008 to May 2008, District Manager Philip Lamb supervised Mr. Williams,

and after Mr. Lamb was discharged in May 2008, Kerri Colvin, a Regional Director, supervised

3

Mr. Williams until Kim Micthell was hired as a District Manager in September 2008.

On July 1, 2008, Colvin spoke to Mr. Williams regarding delinquent SDFs and sample inventory forms. Mr. Williams stated that his SDFs were ready to submit and that his sample inventory form would be ready on the following morning. Mr. Williams told Colvin that his failure to submit his calls daily was due to a problem with the EDGE database that interfaces with DSI sales representatives' laptops to allow them to upload their call logs daily. On July 2, 2008, Colvin still had not received any of Mr. Williams' delinquent documents and e-mailed Mr. Williams to instruct him to submit his sample inventory by the close of business. In the e-mail, Colvin also reminded Mr. Williams that failure to comply with the sample policies and procedures could lead to disciplinary action up to and including termination. Mr. Williams responded to the e-mail acknowledging the delinquent documents and stating "I absolutely understood the procedure and expectations, and am truly sorry about any delays. . . . you won't see my name on any 'bad' lists from this point on." (Doc. 47-1, at 8).

On July 9, 2008, Colvin sent Mr. Williams an e-mail asking why he had failed to submit his weekly SDFs for ten weeks during April to June 2008 and instructed Mr. Williams to submit copes of all remaining SDFs to the regional office by Monday July 14, 2008. Mr. Williams responded to Colvin stating that he had only distributed samples for two weeks during April to June 2008 but had "made corrections in [his] day to day action" since he had a discussion with Colvin about the importance of sampling. (Doc. 47-4, at 32). Williams also stated in the e-mail that all of his calls from April 18, 2008 to July 7, 2008 were missing from the EDGE database but that he currently had the capability to sync through EDGE going forward.

Colvin forwarded Mr. Williams' e-mail to Karie Thoma, a Sample Compliance Analyst,

and Brian Hauser, East Regional Director, with her recommendation that DSI issue a "sternly worded coaching letter" to Mr. Williams. (Doc. 47-4, at 31). On July 14, 2008, Thoma replied to Colvin expressing concern over Mr. Williams' "explanation of events" and specifically his EDGE synchronization issue and lack of paperwork, but Thoma did not discuss whether a coaching letter should be sent to Mr. Williams. *Id.* Thoma requested Randy Labak, Senior Manager of Sales Force Automation, review Mr. Williams' reported EDGE synching problems.

Also on July 14, 2008, Colvin e-mailed Williams to request an update on the status of his EDGE database and instructed him to 1) complete all SDFs; 2) enter all the calls he claimed were lost in the EDGE database from April 18, 2008 to July 7, 2008, into the EDGE database; 3) accept all outstanding sample shipments; and 4) sync his calls daily from that point forward. Mr. Williams responded to Colvin's e-mail by promising to re-send a transfer form, acknowledge sample shipments in EDGE, and ensure all future calls were entered in EDGE and synced nightly.

On July 17, 2008, Thoma sent an e-mail to Colvin regarding an investigation into Mr. Williams' missing calls from April to June 2008: "Based on all the evidence gathered by Sample Compliance, the Help Desk and the SFA Group, it doesn't appear that the missing data was ever entered into the EDGE nor was the laptop synchronized at all between 4/18 and 6/30. Nothing has been uncovered to suggest that the calls were lost, as there is no record in any source to show this data was initially entered." (Doc. 47-1, at 13). In the e-mail, Thoma also suggested that Mr. Williams send his computer to Randy Labak to run a thorough diagnostic test to check for "hardware/snyching problems." *Id.* Mr. Williams asserts that he correctly entered all data into the EDGE database but the data did not register or synchronize because of a problem with the

database. (Doc. 60-2, at ¶ 17).

Mr. Labak evaluated Mr. Williams computer, and on July 31, 2008, Mr. Labak sent Colvin an e-mail summary of the investigation into Mr. Williams' laptop and EDGE database problems stating that Mr. Williams only attempted to snyc his calls on five dates from March 2008 through mid-July 2008: March 3; March 13; April 18; June 30; and July 7 and did not sync at all between April 17 and June 30.  (Doc. 47-1, at 16-18).  Mr. Labak also reported that Mr. Williams unsuccessfully tried to sync 28 times on June 30, 2008 and had made no calls to the helpdesk since he was hired in January to attempt to correct his EDGE problems until June 30, 2008.  Mr. Williams does not dispute that he only successfully entered calls twice from March to July—April 16 and April 18—but he alleges that he had correctly entered the data but it failed to register because of problems with his EDGE database.  (Doc. 60-2, at ¶ 17). Mr. Williams also asserts that DSI only evaluated his laptop after he received a working EDGE database. *Id.*

On August 27, 2008, Colvin e-mailed Mr. Williams to reiterate that administration and organization were core competencies required of sales representatives; to set a time for a meeting with herself, Mr. Williams, and the new Birmingham District Manager; and to ask Williams to 1) confirm that he had completed and submitted his sample inventory form, which was originally due on August 22, 2008; 2) confirm that he sent his delinquent Budget Tracker, which was due on August 22, 2008; 3) ship his outstanding expense reports to the regional office, which should have been submitted by the 4th day of each month; and 4) complete several other administrative responsibilities. (Doc. 47-4, at 29).

On September 2, 2008, DSI hired Kim Mitchell to replace District Manager Philip Lamb, and Mitchell began supervising Mr. Williams. Also on September 2, 2008, Colvin sent an e-mail

6

to Thoma informing her that all sales representatives in the Birmingham District except Mr.

Williams had submitted their August sample inventory and also stated that Mr. Williams'

"documentation continues to be an on-going concern. . . ." (Doc. 47-1, at 24). Thoma responded

to the e-mail on the same day confirming that Mr. Williams had not submitted his August sample

inventory and informing Colvin that Mr. Williams had not entered any call activity from July 25,

2008 to September 2, 2008 and that it did not appear Mr. Williams was "synching daily and/or

entering his calls." *Id.*

The following day, Colvin sent an e-mail to Delon Glasgow, a Human Resources

Manager, informing him that Mr. Williams had not followed through on sampling and

documentation in August. (Doc. 47-1, at 26). Colvin stated in the e-mail:

> At the end of July, Randy Labak confirmed that [Mr. Williams'] computer was in
> working order. I made it clear that failure to adequately record sample activity on
> SDFs and in the EDGE were very serious . . . compliance violations. He
> understood the severity of the situation and committed that all calls and activity
> would be entered, and that his administrative responsibilities would be met.
>
>  Last Wednesday we discussed the new [District Manager] coming onboard, and
> the delivery of a coaching letter. Given that we now have the August data that
> shows the similar pattern, Brian Hasuer and I feel that a warning letter is much
> more appropriate. If this were just miscellaneous admin[istration], a coaching
> letter would suffice. With sampling being a key component of the missing
> documentation, a warning letter is warranted.

*Id.* The same day, Colvin also sent an e-mail to Thoma stating that Labak found Mr. Williams'

computer in working order at the end of July, that Williams had already been verbally counseled

about his deficiencies in documentation, and that Mr. Williams acknowledged that any further

failures would result in him being disciplined. (Doc. 47-4, at 30).

DSI alleges that Mr. Williams did not join the September 8, 2008 mandatory Birmingham

District conference call led by Colvin and new District Manager Mitchell, but Mr. Williams asserts that he did attend the conference call. (Doc. 60-2, at ¶ 19). Mr. Williams, however, does not dispute that he failed to open the e-mail invitation to the meeting sent on September 5, 2008.

On September 9, Mr. Williams met with his new District Manager, Mitchell, and several other sales representatives. Mitchell had asked each sales representative to put together an overview of their planning practices for field ride preparation, their best practices, and requested a copy of their routing and field ride calendar. DSI alleges that Mr. Williams did not prepare the overview, but Mr. Williams stated in his affidavit that he did prepare it. (Doc. 60-2, at ¶ 20).  Mr. Williams, however, does not dispute that Mitchell asked Mr. Williams to meet her on September 10, 2008 to deliver specific documents that Mr. Williams had not previously submitted. DSI alleges that Mr. Williams missed the September 10 meeting, but Mr. Williams stated in his affidavit that he did attend the meeting. (Doc. 60-2, at ¶ 37).

On September 17, 2008, Mitchell rode with Mr. Williams to observe his call and sampling practices. Prior to the field ride, Mitchell met with Mr. Williams to go over sales representatives' expectations and sales rankings. Mr. Williams alleges that Mitchell told him he was ranked first in sales in the Birmingham District, and Mitchell stated in her deposition that Mr. Williams was number one in his district. (Doc. 60-2, at ¶ 22; Doc. 47-8, at 119). During the field ride, Mr. Williams took Mitchell to a doctor's office at Medical Center East where he did not have an appointment scheduled. Mr. Williams acknowledges that he did not have an appointment scheduled but asserts that neither of the doctors he went to see required an appointment to be made for sales calls. Instead, the doctors had the practice of accepting the first three sales representatives who arrived in the morning and the first three in the afternoon, and

8

thus Mr. Williams was not required to make an appointment. (Doc. 60-2, at ¶ 22-23).

DSI alleges that Mr. William's wife, who was also a pharmaceutical sales representative for a different company asked the receptionist to give her appointment to Mr. Williams. Mr. Williams disputes that his wife gave up her appointment for him but states that his wife was the third sales representative to arrive that morning and asked the receptionist at the doctor's office to defer to her husband to take the third slot. (Doc. 60-2, at ¶ 24). DSI asserts that Mr. Williams missed his 1:30 p.m. appointment that afternoon, but Mr. Williams alleges that he missed the call because of his lunch with Mitchell. *Id.* at ¶ 25. Mitchell never drafted a field contact report for Mr. Williams even though DSI expected all District Managers to draft these reports. The purpose of such report is to tell sales representatives what they did well and where they need improvement.

Mitchell instructed Mr. Williams to deliver a list of the top thirty-five doctors who prescribed a drug named "Effient" by September 19, 2008, but Mr. Williams failed to do so. Mr. Williams does not dispute that he failed to provide the list but states that he "had no way of identifying which doctors might prescribe the DSI-marketed drug 'Effient' . . . ." *Id.* at ¶ 26. On September 24, 2008, Mitchell called Mr. Williams to discuss several pending issues, including the fact Mr. Williams had not submitted the list of thirty-five "Effient" doctors or his list of nominated "Effient" speakers, which Mitchell had previously requested in an e-mail. On the same day, Mr. Williams returned Mitchell's call and Mitchell told Mr. Williams that she was not witnessing any effort on his part to clear up any compliance issues or work on the completion of assignments. In her sworn declaration, Mitchell stated that Mr. Williams "acknowledged his deficiencies. He also stated that he was not reading his email. . . [H]e said he knew it 'didn't look

good.'" (Doc. 47-6, at ¶ 27). Mr. Williams asserts that Mitchell did not speak to him about any compliance issue or his completion of assignments and also asserts that he did not acknowledge any deficiencies, but he does not dispute that he was not checking his e-mail. (Doc. 60-2, at ¶ 27).

DSI alleges that Mr. Williams failed to attend a large physician dinner program on September 24, 2008 without notice or explanation. Mr. Williams does not dispute that he did not attend the dinner, but he asserts that he was not scheduled to attend the dinner or required to attend as part of his job duties. (Doc. 60-2, at ¶ 29). DSI alleges that Mr. Williams then failed to attend a scheduled physician lunch program on September 26, 2008 without notifying his workmates that he would be absent and without securing another sales representative to cover his absence. Mr. Williams disputes that he was absent from the lunch and contends that he was late to the lunch because of his wife's illness but informed co-worker Maria Soldevilla that he would be late. *Id.* at ¶ 30.

On September 29, 2008, Linda Smith, an analyst for a third party vendor that assists DSI with sample management and accountability, informed Mitchell that Mr. Williams had not submitted any sample cards since July 25, 2008. From January to June 30, 2008 Mr. Williams had only distributed 232 samples. Also on September 28, 2008, Mitchell sent Colvin a six page memo concerning Mr. Williams "to chronicle events and address immediate concerns relating to samples compliance and field sales proficiency." (Doc. 47-6, at 13-19). Ultimately, Mitchell felt strongly that "the events speak loudly that Ross Williams is an individual who is knowingly negligent in sample accountability and administrative non-negotiables. He is aware of these issues and has taken no effort to turn it around. . . . A timeline for further action should be

10

determined immediately." *Id.* at 18.

On October 1, 2008, DSI issued Williams a Warning Letter stating that Mr. Williams'
performance was not meeting DSI's standards and that Mr. Williams was repeatedly failing to
meet expectations despite months of counseling by DSI management. (Doc 47-4, at 11-14). The
Warning Letter identified specific performance and compliance deficiencies at issue including
Mr. Williams' failure to sync calls to EDGE daily, his failure to submit SDFs weekly, and his
failures to communicate with DSI management. As of October 1, 2008, Mr. Williams had not
synced his calls to EDGE since August 7, 2008 even though his computer was working and he
was required to sync daily. Mr. Williams also failed to submit SDFs on a weekly basis despite
clear and repeated instruction that SDFs were due at the end of each week. The Warning Letter
stated specific objectives that Mr. Williams was required to meet to avoid further disciplinary
action, up to and including termination. Mr. Williams signed the Warning Letter on October 1,
2008, to acknowledge his receipt and understanding of the letter. Mr. Williams did not receive a
Coaching Letter before his October 1, 2008 Warning Letter. Mr. Williams alleges that DSI
usually starts any employee disciplinary process with a Coaching Letter, but DSI alleges that a
Coaching Letter is not required as initial discipline for failure to correctly document samples and
some offenses are immediately terminable without coaching or warning letters.

On October 10, 2008, Mitchell sent Colvin a report showing that Mr. Williams had only
synced five times since August 2008: August 7, October 3, October 7, October 8, and October
10.  (Doc. 47-4, at 40). Additionally, the report stated that all of Mr. Williams' calls for August 5
through August 14 were delinquently entered on October 3, 2008.  Mitchell felt that a Final
Warning was necessary because Mr. Williams was not fulfilling the obligations set forth in his

Warning Letter. Mr. Williams disputes that he was not fulfilling the obligations set forth in the Warning Letter and stated in an affidavit that he synced his calls and handed out drug samples to physicians in compliance with his Warning Letter.  (Doc. 60-2, at ¶ 31).

On October 27, 2008, DSI issued Mr. Williams a Final Warning based on his perceived failure to comply with the terms of his October 1, 2008 Warning Letter. The Final Warning specifically outlined Williams' deficiencies including among other things: failure to meet sampling expectations; failure to submit SDFs on a weekly basis; failure to rectify missing SDFs; inappropriate recording of sample distribution; inconsistencies within call logs; failure to backlog calls from July 2, 2008 to August 30, 2008, by October 3, 2008; failure to sync to EDGE by 5 p.m. daily; failure to submit already overdue expense reports; improper completion of expense reports; failure to log calls for which an expense reimbursement was requested; failure to complete required training tests in DSI's Pedagogue system;  untimely submission of the October calendar of field activity; and failure to submit the November calendar of field activity. (Doc. 47-4, at 19-21). The Final Warning instructed Mr. Williams that "[a]ll objectives must be completed in their entirety, accurately, and on time by Monday, November 3, 2008" or he would be terminated. *Id.*

DSI alleges that after receipt of the Final Warning Letter, Mr. Williams failed to complete the required objectives. Mr. Williams disputes that he did not complete the required objectives and stated in an affidavit that he "completed the objectives outlined by Colvin and Mitchell in my Final Warning Letter which was dated October 27, 2008, to the extent it was possible to do so in the five business days before I was fired." (Doc. 60-2, at ¶ 32). On October 30, 2008, Colvin sent Mr. Williams an e-mail reminding him about the upcoming EDGE upgrades and

12

advising him that he should sync his calls by October 31, 2008 at 5 p.m. and notify Colvin, Mitchell, and Stephanie Alfieri, a Human Resources Manager, that he had done so. On October 31, 2008, at 9:10 p.m. Mr. Williams e-mailed Colvin, Mitchell, and Alfieri saying that he had entered "almost all back dated calls and synced." (Doc. 47-11, at 21). Later that same night, Mitchell sent an e-mail to Colvin and Alfieri detailing the deficiencies of Mr. Williams' Field Activities Report and concluding that Mr. Williams had not met the terms of his Final Warning. (Doc. 47-11, at 11). Mitchell also expressed concern about the accuracy and authenticity of some of Mr. Williams' call entries and that the calls entered from August 14 to October 1, 2008 were inputted as the wrong type of call. *Id.*

DSI terminated Mr. Williams' employment on November 4, 2008, and Colvin made the final decision to terminate Mr. Williams.[1] Mitchell and Colvin decided to proceed with terminating Mr. Williams based on "the compliance and performance issues previously addressed by Management, his failure to meet the terms set forth in his Warning and Final Warning, and genuine concerns about the accuracy and validity of Williams' call and sample distribution documentation." (Doc. 46, at 22). Immediately following Mr. Williams' termination meeting, Mitchell discovered 27,000 to 30,000 samples stacked from the floor to the ceiling in Mr. Williams' storage unit, many of which were expired. Mitchell has never seen a sales representative accumulate so many samples, and she indicated that the enormous number of samples is evidence that Mr. Williams did not adequately sample during his calls.

---

[1] DSI's brief in support of summary judgment states that DSI terminated Mr. Williams on November 4, *2012* (doc. 46, at 22) (emphasis added), and Mr. Williams does not dispute this fact. The court, however, assumes this date is a typographical error and corrects the year to reflect 2008 as opposed to 2012.

Mr. Williams alleges that DSI had two female sales representatives take over his sales duties in his geographical territory. DSI disputes that neither of these females replaced him. Instead, DSI alleges that sales representatives work in teams of three and all three team members cover the same geographic area. Before Mr. Williams was terminated, he was on a team with two females, and when he was terminated, those two females continued working that geographic area. DSI alleges it replaced Mr. Williams with Pat Pontarelli, a male, in January 2009, and Mr. Williams recognized that Pat Pontarelli was "the one that replaced me from my position." (Doc. 47-3, at 190).

### 2.   Mr. Williams' Alleged Comparators

Mr. Williams claims that three female co-workers, Amy Holmes, Kamilah Gray, and Christy Mascolo-Brown[2] committed acts of misconduct during their employment with DSI and that DSI allowed these employees to disregard company policy without disciplining them. Mr. Williams alleges that Amy Holmes, a Birmingham District sales representative, visited the gym during work hours, but Mr. Williams learned of these gym visits through the "rumor mill" only after his termination. Mr. Williams never reported Ms. Holmes to management and has no idea if anyone else ever reported her to management.  Mr. Williams also alleges that DSI was concerned about Ms. Holmes taking classes during working hours but that Ms. Holmes was not disciplined in any way. DSI alleges that it was in the process of investigating Ms. Holmes when she resigned

---

[2] In its brief, DSI stated that Mr. Williams alleged Amy Holmes, Sheree Bishop, and Maria Soldevilla as comparators, but in his responsive brief, Mr. Williams put forth Amy Holmes, Keisha Jackson, and Christy Mascolo-Brown as comparators. In its reply, DSI corrected Mr. Williams' mistaken identification of Kamilah Gray as Keisha Jackson, and thus the court will assume for purposes of this motion that Mr. Williams is producing Amy Holmes, Kamilah Gray, and Christy Mascolo-Brown as his comparators and that any citation to Keisha Jackson actually refers to Kamilah Gray.

in 2013, several years after Mr. Williams had been investigated and then terminated in 2008.

Mr. Williams alleges that Colvin wrote a note before Mr. Williams was terminated suggesting that Christy Mascolo-Brown was possibly guilty of fraud and that Mascolo-Brown was not disciplined in any way for the alleged fraud. (Doc. 60-4, at 2). DSI objects to the introduction of Colvin's handwritten notes as hearsay and asserts that Ms. Mascolo-Brown was not accused of the same compliance issues as Mr. Williams and resigned from her employment at DSI, and thus the evidence is irrelevant to Mr. Williams' case.

Mr. Williams alleges that Kamilah Gray had the same performance issues as he did: not properly documenting calls and not distributing drug samples, but was issued a Coaching Letter rather than a Warning Letter. (Doc. 47-9, at 331-333). DSI recognizes that Gray was at some point issued a Coaching Letter for a "different situation" than Mr. Williams but was eventually fired for working two jobs, which is a terminable offense. *Id.*

Colvin's June 9, 2008 performance review noted that her "gender hires were disproportionately female (70%)." (Doc. 59-1, at 59). Craig Mangean, Executive Director of Human Resources, however, stated that DSI did not have any racial or gender hiring goals.

### 3.   District Manager Lamb's Employment at DSI

District Manager Philip Lamb, who oversaw Mr. Williams, was terminated on May 2, 2008, after DSI allegedly conducted an investigation that revealed violations of DSI's sexual harassment and standards of business conduct policies. (Doc. 47-13, at 19). Mr. Williams disputes that Lamb violated any DSI policies, but the only evidence he offers to support his allegation is Lamb's July 31, 2008 EEOC charge that alleges DSI terminated him because of his gender. (Doc.16-1, at 11).

15

Lamb's EEOC Charge does not mention Mr. Williams nor was Mr. Williams a participant in Lamb's EEOC Charge or DSI's investigation of Lamb. Mr. Williams was at the event where Lamb was accused of making sexually inappropriate remarks to a co-worker but was never interviewed by DSI concerning these allegations. Mr. Williams and Mr. Lamb were neighbors and saw each other socially every four months or so. Colvin at some point did allege that Lamb hired Mr. Williams without following company interview policy because he was his friend.

    B.    <u>Procedural Background</u>

Mr. Williams filed his EEOC Charge of Discrimination on December 16, 2010, and the EEOC dismissed the charge and issued a notice of right to sue on July 18, 2011. Mr. Williams filed a two count complaint in this court on October 14, 2011 claiming that DSI had discriminated against him because of his gender and retaliated against him for Mr. Lamb's filing an EEOC charge. (Doc. 1). DSI filed a motion to dismiss the complaint because it was time barred and because Mr. Williams did not exhaust his administrative remedies before filing this case. (Doc. 6). The court did not find these arguments persuasive and denied DSI's first motion to dismiss on February 14, 2012. (Doc. 10). On June 19, 2012, with leave of the court, Mr. Williams filed an Amended Complaint adding a claim that DSI was wanton in its failure to train, supervise, and retain its employees. (Doc. 26). DSI filed a motion to dismiss the wantonness claim for failure to state a claim under which relief can be granted (doc. 27), and the court granted the motion to dismiss on August 21, 2012. (Doc. 35).  After discovery, DSI filed a motion for summary judgment on the remaining two claims in Mr. Williams' Amended Complaint: gender discrimination and retaliation under Title VII. The parties have fully briefed

16

the motion, and the court now considers the motion. (Doc. 45).

II.    STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."   *Anderson v.*

17

*Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).   In responding to a motion for summary

judgment, the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material fact."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).   The non-moving party must "go beyond the pleadings and by [its]

own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324

(quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963

Amendment of Fed. R. Civ. P. 56(e) ("The very mission of summary judgment procedure is to

pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

trial.").   The moving party need not present evidence in a form admissible at trial; "however, he

may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324.   If the evidence is "merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477

U.S. at 249–50 (citations omitted).

    In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988).   The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  "Even if a district court

'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant

summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)  (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

III.   LEGAL DISCUSSION

    A.   Gender Discrimination Claim

Mr. Williams alleges that DSI engaged in unlawful gender discrimination under Title VII of the Civil Rights Act of 1984, 42 U.S.C. § 2000e, *et seq.* One way to establish a claim of gender discrimination is through direct evidence.  *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997).  If  the plaintiff cannot prove discrimination by direct evidence, as in this case, the plaintiff must establish his *prima facie* case through the burden shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Nevertheless, the "ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated . . . remains with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 251-52 (1981).

Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a *prima facie* case of [gender] discrimination." 411 U.S. at 802. "A plaintiff establishes a prima facie case of discriminatory discharge by showing that: (1) he was a member of a protected class; (2) he was qualified for the job from which he was discharged; (3) he was discharged; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly situated individual outside his protected class." *Howard v. Oregon Television, Inc*., 276 F. App'x 940, 942 (11th Cir. 2008) (citing *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.,* 342 F.3d 1281, 1289 (11th Cir. 2003)).

In this case, Mr. Williams was a member of a protected class because he was male, satisfying the first element of a *prima facie* case of discriminatory discharge.  *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) (Title VII's prohibition of discrimination "because of ... sex" protects men as well as women).  DSI does not dispute that Mr. Williams was qualified for his job as a sales representative, nor do they contest that Mr. Williams' discharge satisfies the third element of a *prima facie* case of discriminatory discharge. The real issue arises under the fourth element and whether Mr. Williams was replaced by a female and/ or he has put forth valid comparators sufficient to prove a *prima facie* case of discrimination. Although Mr. Williams argues that he was replaced by two females, that argument fails on its face because in his deposition even Mr. Williams recognized that a male, Pat Pointarelli, ultimately replaced him as a sales representative at DSI. Thus, Mr. Williams must

20

present evidence of valid comparators to prove a *prima facie* case of discriminatory discharge.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998) (quoting *Holifield*, 115 F.3d at 1562 (11th Cir. 1997)). "Employees are similarly situated when they are accused of the same or similar conduct. . . . . The conduct must be nearly identical 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Howard*, 276 F. App'x at 942 (quoting *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001)).

In this case, Mr. Williams has failed to produce any evidence of a female sales representative who was accused of the same continuous and delinquent compliance, sampling, and documentation issues that he was. Mr. Williams presented evidence that Ms. Holmes went to the gym and took classes during business hours, which is conduct that is in no way related to the documentation and sampling issues about which DSI management continually warned Mr. Williams. Mr. Williams also presented evidence that Ms. Mascolo-Brown was possibly guilty of some kind of fraud. Without addressing the issue that this evidence is possibly impermissible as hearsay, it is clearly insufficient to prove that Ms. Mascolo-Brown is a valid comparator. In his affidavit, Mr. Williams states that the only reason DSI gave him for his termination was "alleged fraud," but he cannot now claim fraud was the reason for his termination after receiving a Warning Letter and a Final Warning outlining his continued and persistent compliance, sampling, and documentation issues as the reasons for his disciplinary action and ultimately his termination. (Doc. 60-2, at ¶ 39).

Mr. Williams produced evidence that Mitchell testified that Ms. Gray "was not inputting calls and she was not properly documenting calls, [and] she was not distributing samples." (Doc. 47-10, at 333). This is the same conduct of which Mr. Williams was accused and for which he was disciplined and ultimately terminated. Mitchell, however, also testified that Ms. Gray was terminated because she was working another job at the same time that she was a DSI sales representative and that Ms. Gray was a "different situation" than Mr. Williams. *Id.* Even assuming that Ms. Gray engaged in the same misconduct as Mr. Williams, the "quantity and quality of the comparator's misconduct must be nearly identical" to be considered a valid comparator. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Here, Mr. Williams merely cites to three lines of deposition testimony about Ms. Gray and does not produce any further evidence that illustrates she had the same *pervasive* and *continuing* problems that he did.

Additionally, in his responsive brief, Mr. Williams incorrectly identifies Mitchell's testimony as about Keisha Jackson, further illustrating that Mr. Williams is not able to identify a similarly situated female sales representative and cannot present any meaningful evidence of a similarly situated female comparator. A close reading of Mitchell's deposition reveals that although Ms. Gray may have had similar compliance issues, Mr. Williams is not able to show that she is "nearly identical" to himself because of the lack of any evidence about continuing and pervasive syncing, sampling, and documentation problems.

The court finds that Mr. Williams has not presented sufficient evidence of any valid comparators to present a *prima facie* case of discriminatory discharge. Even assuming *arguendo* that Mr. Williams were able to present a *prima facie* case for discrimination, he cannot prove that DSI's proffered legitimate reasons for his termination were a pretext for discrimination. As

discussed in the next section, because the *McDonnell Douglass* burden shifting analysis applies

to both Mr. Williams' discrimination and retaliation claims, the court will consider whether he

can show that DSI's proffered legitimate reasons for his termination are pretext for both of his

claims together after analyzing Mr. Williams' *prima facie* showing of his claim for retaliation.

> B. <u>Retaliation Claim</u>

Mr. Williams charges DSI with retaliation under Title VII in Count II of his Amended

Complaint. Under Title VII, it is "an unlawful employment practice for an employer to

discriminate against any of his employees or applicants for employment . . . because he has

opposed any practice made an unlawful employment practice by this subchapter, or because he

has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (1982). The court analyzes

claims of retaliation for engaging in a protected activity, like those for discrimination, under the

*McDonnell Douglas* burden-shifting framework. *Bernard v. SSA Security, Inc.*, 2008 WL

4823987, at *2 (11th Cir. 2008).  Under the *McDonnell Douglas* framework, the plaintiff "must

carry the initial burden under the statute of establishing a prima facie case" of retaliation.

*McDonnell Douglas*, 411 U.S. at 802.

To establish a prima face case of retaliation under Title VII, "a plaintiff must show that

(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action;

and (3) there is a causal connection between the two events." *Johnson v. Booker T. Washington*

*Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (internal quotation marks omitted).

To constitute "statutorily protected expression," a plaintiff must show he either opposed

unlawful practices or he participated in a Title VII proceeding.  42 U.S.C. § 2000e-3(a) (1982).

Mr. Williams concedes that he did not make any internal complaints of discrimination or retaliation while he was at DSI and that he did not testify, assist, or participate in any investigation, hearing, or proceeding under Title VII. Mr. Williams' retaliation claim rests on his "perceived relationship" with District Manager Lamb who filed an EEOC charge against DSI while Mr. Williams was still employed by DSI.

Mr. Williams relies on the recent Supreme Court decision in *Thompson v. North American Stainless, LP* for the proposition that he can bring a civil action against DSI because DSI's action would have dissuaded a "'reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. N. Am. Stainless, LP*, ____U.S. ____, 131 S. Ct. 863 (2011) (quoting *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 68 (2006)).   In *Thompson*, the plaintiff sued North American Stainless ("NAS") for retaliation because NAS fired the plaintiff after his fiancée filed an EEOC charge against NAS for sex discrimination. The Supreme Court ruled that a "reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancée would be fired." *Thompson,* 131 S. Ct at 868. Because Title VII's antiretaliation provision "prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination,'" the Supreme Court ruled that the plaintiff could bring a retaliation action based on his fiancee's protected conduct. *Id.* (quoting *Burlington*, 548 U.S. at 68).   The Supreme Court specifically refrained from identifying a "fixed class of relationships for which third-party reprisals are unlawful," but did state that "firing a close family member will almost always meet the *Burlington* standard., and inflicting a milder reprisal on a mere acquaintance will almost never do so . . ." *Thompson,* 131 S.Ct at 868.

24

Mr. Williams is not a familial relation of Lamb, and the court finds it charitable to even consider Lamb an acquaintance of Mr. Williams in light of the evidence that the co-workers saw each other only very rarely in a social setting. Mr. Williams argues that Colvin "perceived" Mr. Williams and Lamb as very close acquaintances but presents no real evidence to support this perception. Even assuming that Colvin did think Mr. Williams and Lamb were friends, that still does not put Mr. Williams in the category of relationships that the Supreme Court ruled were appropriate for third-party reprisal claims in *Thompson*. Mr. Williams has not presented any evidence to show that he can bring a third-party reprisal claim for Lamb's conduct, and thus he clearly has not produced sufficient evidence to make a *prima facie* showing of retaliation. The court need not engage in an analysis of the remaining elements necessary to prove a claim of retaliation, but regardless, even if Mr. Williams were able to make a *prima facie* showing, he still cannot rebut DSI's proffered legitimate reasons for his termination, as discussed below.

C.      Pretext

The court will consider Mr. Williams' claims of discrimination and retaliation together because DSI's legitimate reasons for his termination and Mr. Williams' rebuttal are the same for both claims. Once the plaintiff establishes his *prima facie* case of discrimination or retaliation, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. Once the employer shows a legitimate, nondiscriminatory reason for its decision, the employee must "be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804. To survive summary judgment, the employee must show "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's

proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper*, 390 F.3d at 725.

In this case, DSI proffers that it terminated Mr. Williams after issuing him a Warning Letter and a Final Warning because of Mr. Williams' "compliance and performance issues previously addressed by Management, his failure to meet the terms set forth in his Warning and Final Warning, and genuine concerns about the accuracy and validity of Williams' call and sample distribution documentation." (Doc. 46, at 22). Those compliance and performance issues were failing to sync daily, failure to properly document calls, and failure to sample in accordance with DSI's expectations.

"[A] reason cannot ... be a 'pretext for discrimination' unless it is shown both that the reason was false, *and that discrimination was the real reason.*" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)(emphasis added). "Because the plaintiff bears the burden of establishing pretext for discrimination, he must present significant probative evidence on the issue to avoid summary judgment." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir.1996) (citation omitted). "Conclusory allegations or unsupported assertions of discrimination, without more, 'are not sufficient to raise an inference of pretext.'" *Tiggs-Vaughn v. Tuscaloosa Housing Auth.*, 385 F. App'x 919, 923 (11th Cir. 2010) (citing *Mayfield*, 101 F.3d at 1376)). "Rather, the plaintiff must meet the proffered reason 'head on and rebut it.'" *Id.* (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.2000) (en banc )).

Mr. Williams argues that evidence of pretext exists in this case because he had a good employment history with DSI and only began receiving poor evaluations after DSI terminated Lamb, and Colvin and Mitchell began supervising him. Mr. Williams is correct that in some

instances when a factual dispute exists over a particular evaluation of an employee, a sudden change in evaluation can be evidence of pretext, but that is not the case here. *See Damon v. Fleming Supermarkets of Florida*, 196 F.3d 1354, 1361 (considering circumstantial evidence of discrimination where employees with good employment histories suddenly began receiving poor evaluations when a new supervisor came on). Mr. Williams acknowledged and recognized in several e-mails his deficiencies as pointed out to him by his supervisors in not syncing his EDGE database daily and not meeting DSI management's expectations. "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important." *Rojas v. Florida,* 285 F.3d 1339, 1343 (11th Cir. 2002) (citing *Jones v. Gerwens*, 874 F.2d 1534, 1542 n. 15 (11th Cir.1989)). Nothing in the record supports Mr. Williams' argument that evidence for pretext exists in his receipt of poor evaluations after Colvin and Mitchell took over his supervision.

Mr. Williams also argues that DSI's "inconsistent reasons" for terminating him show evidence of pretext. In his affidavit, Mr. Williams stated that at the time of his termination Stephanie Alfieri told him he was being terminated for "potential fraud." (Doc. 60-2, at ¶ 39). Mr. Williams argues that this reason is inconsistent with DSI's proffered reason for terminating him: failure to properly snyc, sample, report, and document in compliance with DSI policies. "Potential fraud" and a possibility that Mr. Williams was improperly or fraudulently documenting calls and samples are not inconsistent reasons for termination. Additionally, Mr. Williams was put on notice about his compliance and other issues in his Warning Letter and Final Warning and given an opportunity to remedy the problems, which he did not do.

As DSI points out, Mr. Williams seems to confuse the notion of inconsistent reasons and

cumulative or complementary reasons. Just because DSI cited both "possible fraud" and compliance issues as reasons for Mr. Williams' termination, does not mean that neither one of them was true and discrimination was the actual reason he was fired. Because Mr. Williams cannot make a *prima facie* showing of discrimination or retaliation and cannot show that DSI's legitimate, non-discriminatory reasons were pretext for discrimination or retaliation, the court will GRANT summary judgment for DSI on both of Mr. William's claims.

IV.     CONCLUSION

For the foregoing reasons, the court will GRANT DSI's Motion for Summary Judgment in its entirety; will DISMISS WITH PREJUDICE all of Mr. Williams' claims against DSI; and will ENTER JUDGMENT in favor of Defendant Daiichi Sankyo, Inc. and against Plaintiff Ross Williams. The court will simultaneously enter an order to that effect.

DONE and ORDERED this 20th day of May, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE